## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

In Re:                                          Bankruptcy No.: 16-30542
                                                Chapter 12
Kent M. McDougall and
Erica M. McDougall,

      Debtors.

_____/

Kent M. McDougall and                           Adversary No.: 16-7027
Erica M. McDougall,

      Plaintiffs,

v.

AgCountry Farm Credit Services, PCA,
Michael McDougall and Bonita McDougall,

      Defendants.

_____/

### MEMORANDUM AND ORDER

## I.   INTRODUCTION

Plaintiffs/Debtors Kent M. McDougall and Erica M. McDougall filed an Amended

Complaint, alleging that Defendant AgCountry Farm Credit Services, PCA fraudulently

obtained Debtors' consent to a mortgage they granted to AgCountry on March 31, 2016.

See Doc. 19.  Specifically, Debtors claim they acquired a certain parcel of real estate

from Defendants Michael and Bonita McDougall (Debtor Kent McDougall's parents) and

offered it as security in the March 31, 2016 mortgage with the understanding that

AgCountry would loan additional operating funds and restructure certain debt

obligations.  Debtors also allege that AgCountry fraudulently obtained Michael and

Bonita McDougall's consent to transfer real property to Debtors so Debtors could pledge it to AgCountry.

Debtors pled three causes of action. In their first cause of action, Debtors seek to rescind the deed from Michael and Bonita McDougall to Debtors and the March 31, 2016 mortgage Debtors granted to AgCountry. In their second claim, Debtors seek a determination regarding the priority and amount of AgCountry's interests and Michael and Bonita McDougall's claims related to the property Debtors granted in the mortgage to AgCountry. In their third cause of action, Debtors allege that their grant of the March 31, 2016 mortgage to AgCountry was a fraudulent conveyance under 11 U.S.C. § 548. The Court granted summary judgment in favor of AgCountry and dismissed the claim under section 548. The Court tried this matter on May 22 and 23, 2017.

The Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1334(b). The parties consented to trial by this Court and do not dispute that this Court has authority to enter a final order in this case. This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## II.   FACTS

### A.   Background

Debtors are farmers and ranchers. They have been farming for over 10 years, but did not begin raising cattle until 2007. In 2007, they began living on a 160-acre parcel of land near Rock Lake in Towner County, North Dakota, which they refer to as

the "Home Quarter."[1]  In 2009, they purchased the Home Quarter and additional land in

Towner County by contract for deed from Ed Kaleva.  Debtors refer to this real estate as

the "Kaleva Land," comprising 880 acres.  In 2011, after a "tough year," Debtors sold

the Home Quarter to Michael and Bonita McDougall and used the $180,000 in proceeds

to reduce their debt.  Debtors continued to live on the property rent free, intending to

eventually repurchase the parcel from Michael and Bonita McDougall.

Debtors expanded their cattle operation over the years.  Toward the end of 2011

or beginning of 2012, they began to borrow funds from Turtle Mountain State Bank

("TMSB").  TMSB supplied Debtors with several lines of credit to finance their cattle and

farming operations.  Debtors granted TMSB a first-position security interest in all of their

cattle and equipment and a second-position security interest junior to the Bank of North

Dakota in all of their land.  Erica McDougall testified that 2012 was a good year for their

operation, allowing them to reduce their debts to TMSB and the Bank of North Dakota.

In 2013, Debtors sought financing for their farming operation from AgCountry.

Dean Aanderud, a loan officer with AgCountry in the Langdon branch office, serviced

their account from 2013 until April 4, 2016.  Stmt. of Undisputed Facts at ¶ 2.  In 2013,

---

[1] The 160 acres includes land from two different quarters but, for ease of reference,
the parties refer to the property as the "Home Quarter."  The legal description of the Home
Quarter is:

> The North half of the Southeast Quarter (N1/2SE1/4) and the South Half of
> the Northeast Quarter (S1/2NE1/4), Section Twenty-five (25), Township
> One Hundred Sixty-two (162), Range Sixty-seven West (67W) 5th P.M.,
> Towner County, ND.

Stmt. of Undisputed Facts at ¶ 5.  The mortgage granted to AgCountry on March 31, 2016
included a portion of the Home Quarter, excluding approximately 20 acres described as
the S1/2 SW1/4 NE1/4.  Id. at ¶ 6.

Debtors obtained financing from AgCountry to satisfy their obligation to Ed Kaleva under the contract for deed.  Debtors borrowed no other money from AgCountry during 2013 and continued to use their lines of credit at TMSB to finance their operation.

According to Erica McDougall, Debtors' financial situation remained stable in 2013.  In 2014, grain and cattle prices dropped, and Debtors were "running short" of operating capital near the end of the year.  Also in 2014, Debtors learned that their contact at TMSB, Gar Wiedrich, left TMSB.  Erica McDougall testified that TMSB no longer employed a loan officer with farming experience.  Debtors talked to other lenders about financing their operation but ultimately decided to work with Aanerud at AgCountry.  Erica McDougall explained that Aanerud helped Debtors with cash flow and did not express hesitation about Debtors' cattle operation while other lenders did not want to finance cattle operations.

In August 2014, Debtors sought to refinance their debt with AgCountry and to borrow additional funds from it.  They planned to apply the proceeds of the AgCountry loan to their debt at TMSB, with the goal of continuing their operating lines of credit at TMSB.[2]  Debtors held equity in their property at the time, which they assumed would provide incentive to AgCountry to make the loan.  This financing plan progressed slowly.[3]  In the meantime, the 2015 season did not go well.  Erica McDougall testified

---

[2] Originally, Debtors' objective was to transfer all their debt to AgCountry and secure a guarantee from the Farm Services Agency.

[3] To advance the refinancing process, Debtors solicited the help of Jim Hoffert, a professional mediator who has experience helping farmers reach restructuring agreements.  Hoffert communicated with Debtors, Aanerud and Jeff Parks from TMSB in an attempt to mediate a refinance of Debtors' operation.  The mediation was unsuccessful.  The parties made no further mediation attempt after May 2016.

that crop prices and the cattle market fell.  Debtors exhausted their lines of credit with

TMSB and owed it over $1 million.  They began borrowing money from AgCountry to

pay operating expenses.  From August 2014 to December 2015, AgCountry made eight

loans to Debtors summarized as follows:[4]

| Loan Number | Initial Loan Amount | Loan date | Previous Maturity/Payment Term | Modified Maturity/Payment Term |
|---|---|---|---|---|
| *5401 | $27,000 | 8/27/2014 | Annual payment due 1/1/2016 and annually thereafter. Maturity of 1/1/2020. | Annual payment changed to due 6/1/2016 and annually on 1/1 thereafter. |
| *8701 | $16,500 | 1/28/2015 | Payment due 2/1/2016 and annually thereafter. Maturity of 2/1/2020 | Annual payment changed to due 6/1/2016 and annually on 2/1 thereafter. |
| *5201 | $65,500 | 2/6/2015 | Payment due 3/1/2016 and annually thereafter. Maturity of 3/20/2020 | Annual payment changed to due 6/1/2016 and annually on 3/1 thereafter. |
| *5401 | $25,000 | 3/3/2015 | Maturity of 3/1/2016 | Maturity of 6/1/2016 |
| *7101 | $53,000 | 3/26/2015 | Maturity of 4/1/2016 | Maturity of 6/1/2016 |
| *6301 | $46,000 | 4/6/2015 | Maturity of 4/1/2016 | Maturity of 6/1/2016 |
| *1801 | $95,000 | 5/4/2015 | Maturity of 12/1/2015 | Maturity of 6/1/2016 |
| *2701 | $66,800 | 11/24/2015 | Maturity of 4/1/2016 | Maturity of 6/1/2016 |

Stmt. of Undisputed Facts ¶ 3.

---

[4] Debtors also owed money to AgCountry Farm Credit Services, FLCA (an entity related to AgCountry) on a real estate loan that is not reflected in the chart.  AgCountry Farm Credit Services, FCLA, is not named as a defendant in this adversary proceeding. Additionally, Debtors leased personal property from AgCountry.  Stmt. of Undisputed Facts ¶ 3.  The leases are not reflected in the chart.  According to the proof of claim filed by AgCountry, Debtors owe AgCountry Farm Credit Services, PCA $585,525.46, secured by $2,361,000 in collateral.  Ex. 123.  They owe AgCountry Farm Credit Services, FCLA $978,571.99 secured by $1,300,000 in collateral.  Ex. 122.

According to Erica McDougall, most of the promissory notes listed above were unsecured.  AgCountry approved loan *5401 for $27,000 to purchase a used combine, which served as security for the note.  It also granted loan *8701 for $16,500 to purchase bulls, and the bulls served as security for this note.  The other notes memorialized unsecured loans for operating expenses, such as equipment repairs, lease payments and agricultural supplies.

Debtors maintained that the parties did not intend for these notes to be long-term.  Rather, Debtors understood that these notes would be refinanced with other loans, combined with a new loan and rolled into one larger promissory note.  In support of this understanding, Debtors testified that Aanderud repeatedly suggested that the prospects for restructuring and financing a new loan were good.  Debtors explained that they were in frequent contact with Aanderud,[5] who consistently represented that he was working on their financing request, it "looked good," everything was "fine" and they should hear something about their loan and refinancing request soon.[6]

---

[5] Kent McDougall testified that he spoke with Aanderud about once a week.

[6] At trial, Aanderud admitted telling Kent their refinance was looking good in late 2014.  Kent McDougall testified:

Q: Mr. McDougall, did you directly ask Dean Aanderud what the situation was on your refinance in the months of December, January, February?

A: Yes.

Q: And what was his responses?

A: Along the lines that it looked promising or that it looked good and that it should be next week or the end of the month or the end of the year. Depending on what time frame it was there so—

Q: OK, and how often was he saying this to you?

A: Very frequently.

6

When asked if he told Kent McDougall that the prospects for restructuring and a new loan were good on multiple occasions, Aanderud testified that he could not remember but that he might have. At trial, Aanderud highlighted his email to Kent McDougall on February 16, 2016, during which he noted that "two factors that have always been an issue are cash flow and having enough security on the short term side." Ex. 229. Aanderud did not discourage Debtors or otherwise suggest that financing may not be available in this email. Rather, he represented that AgCountry would "look at putting money out there against the Cando loan and probably a bit more against the home farm," if another lender financed cattle and equipment. Ex. 229.

Additionally, Debtors argue that the timing of AgCountry's loans suggest it was considering a different financing arrangement. AgCountry extended $328,000 in credit to Debtors from August 2014 to May 2015. Exs. 206-208. The note dated May 4, 2015 in the amount of $95,000 matured on December 1, 2015. Ex. 208. Kent McDougall testified that, unless they sold their 2015 calves, Debtors could not pay the December 2015 balloon payment because their next significant source of income would not be available until fall 2016 and likely would not be sufficient to make all the installment payments due on the loans to AgCountry.[7] Despite these circumstances, Aanderud authorized a $66,800 loan to Debtors on November 24, 2015, a week before the $95,000 balloon payment was due. Ex. 202.

---

In addition, Erica McDougall testified that, at the end of March, Debtors asked Aanderud where they were at with refinancing their debt and that Aanderud told them he was "working on it," that "things look good" and he would "have more on it by next week."

[7] Debtors claimed that their only sources of income between November 2015 and the fall of 2016 were 2015 calf sales and small receivables from grain sales and custom farming.

With one exception,[8] Aanderud did not express concern about the timely submission of installment or balloon payments to AgCountry or advocate that Debtors liquidate collateral to pay any of these eight loans prior to March 2016. To the contrary, when Debtors explained that they were trying to decide whether they should sell their 2015 calves to pay debts or send them to Iowa with the hope of increasing weight and sale price, Aanderud did not deter them from sending the calves to Iowa.[9] With the belief that they would receive financing from AgCountry, Debtors shipped the calves to Iowa on February 5, 2016 and received a $135,000 advance from the entity that agreed to sell them. Aanderud did not demand that Debtors apply the full advance to AgCountry debt. Instead, he suggested that they use part of the proceeds to make a payment to AgCountry on a Salford equipment lease and apply the remaining balance of the advance toward an interest payment at TMSB.

---

[8] Aanderud encouraged Debtors to make a payment to AgCountry on a Salford equipment lease.

[9] In late 2015, Debtors asked Aanderud if they would receive a new loan or refinancing so they could decide whether to sell their calves at a North Dakota sales barn or send them to Iowa to fatten, potentially increasing the value of each calf by $100. Erica McDougall estimated that liquidating them in North Dakota would have generated $300,000, which Debtors would have used to continue operations and make payments to AgCountry on the notes that were coming due. She explained that sending the calves to Iowa to fatten would generate an additional $45,000 in net proceeds but would require time to fatten the calves before they were sent to market in the fall. Debtors maintain that they sent the calves to Iowa rather than selling them immediately because Aanderud told them their prospects for receiving financing "looked good, it looked fine, [Debtors] should see something coming up" and "the refinance was going to be coming through." Kent McDougall testified that he called Aanderud prior to reaching the decision to ship their calves to Iowa and "flat-out asked him if this was going to go through or not." Aanderud reportedly responded, "yes, not to worry." Aanderud remembered the conversation about shipping calves to Iowa but insisted that he told Debtors it was a business decision they had to make and that they needed to increase their cash flow.

On March 10, 2016, Kent McDougall sent an email to Aanderud, Jeff Parks (with TMSB) and Hoffert (the mediator), asserting that Debtors demonstrated "how we can make things cashflow and work" and asking for operating funds because they had immediate needs. Ex. 105. Debtors "maxed out" their credit cards and needed operating money to ensure survival of their livestock. Ex. 105. At trial, Kent McDougall explained that Debtors "needed something to happen."[10] He requested a meeting the following week. Ex. 105.

Later in March, Aanderud advised Debtors that they needed a loan extension to continue working on the refinance. According to Kent McDougall, Aanderud also suggested that Debtors offer more collateral to secure their debt with AgCountry. Kent McDougall agreed to speak with his father about transferring land he could pledge to AgCountry with the understanding that AgCountry would agree to lend additional funds. Kent McDougall understood that AgCountry employees other than Aanderud had to approve their request for an operating loan before Debtors would receive the money.

## B.    Communication between AgCountry Employees

From September 15, 2015 to March 31, 2016, Aanderud exchanged several emails with Credit Vice President Neal Sundet and Vice President for the Northwestern Region Stacey Sem. In these emails, Aanderud's superiors expressed concerns about Debtors' loan delinquencies and suggested that Debtors' account should be sent to the

---

[10] Aanderud inferred that the delay in processing Debtors' requests for financing was Debtors' fault. He told Debtors AgCountry needed an operating plan and a response or an indication from TMSB regarding Debtors' loan status. He also claimed AgCountry needed an updated appraisal, which he did not order because he was not sure what Debtors planned and how much land was involved.

Special Credit Department of AgCountry for servicing.[11]  Sundet and Sem were
particularly concerned about Debtors' loan delinquency extending beyond 90 days.  At
AgCountry, a loan "goes into non-accrual status" if it is delinquent more than 90 days
and there is no written plan in place.  When a loan is in "non-accrual status," it no longer
accrues standard interest, and AgCountry begins collection efforts.  Sundet testified that
it would be very unlikely for a borrower in "non-accrual status" to qualify for new loans.
Some of the AgCountry communications regarding Debtors' loan delinquencies are
summarized below:

- In a September 15, 2015 conversation, Sundet and Sem both stated to Aanderud that Aanderud should not let the McDougall loan go past 90 days overdue.  Ex. 100.
- On December 21, 2015, Sundet suggested to Aanderud "[i]f we cannot get it resolved in the next few days should we transfer to Special Credit?"  Ex. 102.
- On January 18, 2016, Sundet emailed Aanderud and Sem, asking Aanderud, "Is it time to consider sending [McDougall and another AgCountry client] to special credit as they will be 60 days past due at the end of the month?  If we don't make progress this week I will recommend you transfer them out of the branch." Ex. 103.
- On January 27, 2016, Sundet emailed Aanderud and Sem stating that a McDougall account was nearing 90 days overdue and that "[i]t needs to get posted by Friday and if we don't have a written plan it will go to non-accrual." Ex. 104.
- On February 3, 2016, Sem outlined discussions he had with Aanderud regarding Aanderud's work performance at AgCountry and instructed Aanderud to obtain Kent McDougall's signature on a written plan within two days affirming Kent McDougall's promise to bring a lease current within a week. Sem stated, "I am also going to strongly recommend that you transfer to special credit at this time. . . . Once the lease is cleared up we will need to service aggressively for the next payment.  I will expect that you will have almost daily contact with Kent until this issue is resolved."  Ex. 102.

---

[11]  Eric Schoenherr, Loan Officer in AgCountry's Special Credit Department, explained that the Special Credit Department specializes in handling loans that are past due and working with borrowers with repayment or cash flow problems.

- On March 14, 2016, Sundet emailed Sem and Aanderud expressing concern that "[w]e need the written plan to keep it out of [non-accrual] or should we ship this one to [special credit]?"  Ex. 106.
- On March 22, 2016, Sundet asked Aanderud, "How are we coming on our plans to get these off the past due list? . . . Any timeline[?]," and Aanderud responded, "This week."  Ex. 107.

At trial, Sundet and Aanderud testified that Debtors' loans were not in "non-accrual" status.  They maintained this position even though Debtors did not have a plan in place and, as of March 1, 2016, Debtors were delinquent more than 90 days on note *1801 in the sum of $95,000, which matured on December 1, 2015.

Aanderud, Sem and Sundet also exchanged emails about the status of security Debtors offered to AgCountry.

- On March 14, 2016, responding to Sundet's suggestion that Aanderud send the McDougall account to special credit, Aanderud stated, "I've talked to Kent about [special credit] and he has no objection.  I'd prefer to get the additional collateral to shore this up before shipping him off though."  Ex. 106.

- On March 24, 2016, Sem emailed Sundet and explained, "I told Dean just to get a mortgage signed and do the title work later, don't wait. . . . Think we can do some title work on ownership to get the right names on the mortgage and worry about perfection later, like a month later."  Ex. 102.

- On March 24, 2016, Sundet asked Aanderud, "Can you tell me how we got so upside down on this one?"  Ex. 108.

- On March 28, 2016, Sundet also asked Aanderud: "Do we have signed plans in place for both of these deals [regarding the McDougall account and one other AgCountry account]?  Agribank reviewers will be here next week so it is critical."  Ex. 109.  Aanderud responded, "I'll get you copies."  Id.

- On March 30, 2017, Aanderud wrote: "[McDougall] has several loans that are past due in addition to those coming due.  We have agreed to extend the note maturities in exchange for a PCA Mortgage on all available collateral that will significantly improve our collateral position."  Ex. 110.

In late March, Aanderud prepared a Credit Presentation.  Under the Loan Proposal section of the Credit Presentation, Aanderud summarized the reason he was seeking authority for a loan-related transaction with Debtors.  He wrote:

11

Request 1 – Requesting an extension of the payment/maturity on 8 existing PCA loans.  Requesting an extension to 6/1/2016. . . .  In consideration of extending the maturity on these loans, we will take a PCA mortgage on existing land we have securing an FLCA loan along with additional land that is currently unencumbered. . . .

Purpose of the request for extension is to evaluate the possibility of refinancing our current PCA debt into a FLCA loan secured totally by real estate.  We would either refinance all our existing debt into one FLCA loan or possibly refinance all the existing PCA debt into a new FLCA loan secured with the new land that we are taking as collateral.  Our final goal would be to have all debt secured by real estate and structured so Kent would be able to manage the debt servicing requirements.  We would also potentially look to an outside agency (likely FSA or BND) to help mitigate the risk to AgCountry.  Analysis/approval on final loan structure, terms, guarantees etc. is yet to be determined.  This extension will allow us time to complete the analysis while at the same time shore up our collateral position and bring these loans current.

Ex. 112.

The Credit Presentation form included five factors that AgCountry considers in analyzing a customer's proposed plan: Character/Management, Capital, Capacity, Risk Chain and Collateral.  Ex. 112.  In the Character/Management paragraph, Aanderud noted:  "The biggest concern regarding future operations is planning."  He also observed that Debtors' tendency to increase their permanent herd is a problem for whomever finances the short-term side of Debtors' operation.  In his analysis of Debtors' capital, Aanderud concluded that Debtors' owner equity fell within AgCountry's standards but that their capital debt was of some concern.  He observed that Debtors' working capital of $35,955 was only five percent of AGI, but "the new real estate loan will remedy that."  In his analysis of Debtors' capacity, Aanderud noted that Debtors' operation had been profitable based on a three-year history of income and expenses. He cautioned that "true levels of profitability are a bit hard to determine when income and expense flows don't always occur in the same calendar year."  Doc. 112 at 8.

12

Aanderud did not analyze Risk Chain or discuss Collateral, other than in his comments regarding the loan proposal.

Notably, most of the financial data Aanderud used in the March 30, 2016 Credit Presentation was based on outdated information—2014 actual totals and Debtors' projections for 2015. Also, Aanderud admitted at trial that the Net Recovery Value of Debtors' collateral was short, but he was not sure by how much. Sundet also acknowledged that Debtors' credit risk, as reflected on the March 30, 2016 Credit Presentation, was "on the weaker end of the scale."

Sundet approved the proposed short loan extensions in return for Debtors' agreement to grant AgCountry a security interest in additional real estate. He expressed concerns about Aanderud's collateral analysis, however. He observed:

> The collateral analysis does not consider any of the chattel collateral that we have financed so we need to get out and to [sic] the collateral inspection and find out what we really have. If the collateral documents are not correct we should take appropriate steps to correct them if we can realizing we have another lender involved. As you are aware the servicing of this account has been less than acceptable and it is our expectation that it will be serviced aggressively going forward.

Ex. 112 at 10.[12]

## C. Promissory Note/Loan Agreement Modifications and Mortgage

On March 31, 2016, Debtors met Aanderud at AgCountry's office to sign loan documents. Debtors signed eight Promissory Note/Loan Agreement Modifications for the loans listed above. AgCountry extended the installment payments on notes *5401,

---

[12] Sem conceded at trial that Aanderud "was struggling" at the time. AgCountry supervisors were working with Aanderud on performance issues related to marketing and credit.

*8701 and *5201 to June 1, 2016 and extended the maturity dates on the other notes listed above to June 1, 2016.  Debtors also signed a mortgage securing the eight notes. Ex. 217.  The legal description of real property in the mortgage listed many parcels of real estate, including a portion of the Home Quarter.

Additionally, Debtors signed a "Repayment/Restructure Plan" which provides, in pertinent part:

> Now, there are several loans that are past due and more loans to mature in the next 30 days.  Borrowers are currently unable to repay as agreed.
>
> Borrowers have offered unencumbered land as additional collateral and also offered land that has equity for collateral.
>
> As consideration for extending the borrower's PCA notes to June 1, 2016, Kent and Erica McDougall agree [to] execute a mortgage on all owned real estate to secure all existing and possible future PCA debt with AgCountry.
>
> Efforts will be made to refinance all of this debt into a FLCA loan secured by all real estate owned.

Ex. 118.  Other than the suggestion that "efforts will be made to refinance all of this debt," the note modification, mortgage and Repayment/Restructure Plan do not provide that AgCountry agreed to loan Debtors additional funds or refinance their debt. Aanderud, Sem and Sundet testified that AgCountry had not made a decision to deny Debtors' request for refinancing or new loans on or before March 31, 2017.

Debtors concede that they did not read the note modifications or mortgage before signing them.  Erica McDougall admitted that Aanderud provided Debtors with a folder of complete documents, but they did not review them.[13]  Nevertheless, Debtors

---

[13] At trial, Erica McDougall testified Aanderud only gave Debtors the signature pages to these documents when he asked for their signatures.  She recalled that Aanderud mentioned AgCountry was attempting to save paper.  Aanderud denied this claim, asserting that he provided full copies of each document to Debtors because he

believed that granting a mortgage in the Home Quarter would lead to a new loan with

loan restructuring.  Erica McDougall testified that Aanderud told them that Debtors

"needed to get these [documents] out of the way so we can continue on the refinance

deal."  She admitted that Aanderud did not specifically say the parties were to meet later

to "close on a refinancing deal," but he said that Debtors "should know more next week."

She believed there would be "a closing deal" the following week.  She explained that

she trusted Aanderud and "just went with it," thinking Debtors were "getting a refinance

deal."  Erica McDougall did not specifically remember signing the Repayment/

Restructure Plan but admits that her signature is on it.  She maintained, however, that

she did not know they were signing a mortgage.

Kent McDougall understood that he was signing a mortgage and that AgCountry

was granting payment extensions but believed that, by signing the documents on March

31, AgCountry would agree to loan them additional operating money.[14]  He insisted that

he never intended to give AgCountry a mortgage on the Home Quarter without receiving

additional funds and a refinancing deal.  Kent McDougall explained that "it wasn't

uncommon to sign a note with Dean and then get the money a few days later."  He

anticipated that Debtors would receive proceeds of a new loan after the March 31, 2016

---

always gave customers the full document to sign and an opportunity to review the
documents.  Kent McDougall did not recall whether Aanderud presented them with only
signature pages.

[14] Kent McDougall testified:  "Q: Did you read it at the time?  A: No.  Q: Why not?
A: I had trust in Dean.  Q: OK, you knew he was doing something with the other eight
notes, right?  A: I just thought it was just extending them out.  Q: OK, what about new
operating money going forward?  A: That collateral of—that quarter that we got from my
dad that we were supposed to be getting $200,000 to $250,000 to take to Turtle Mountain
State Bank to pay down our operating note there, and that was revolving line of credit and
so we would have that money available to operate with."

meeting or the parties would meet at a later date to execute more documents, after which Debtors would receive the funds.  He testified: "What I believed in this transaction was happening is that I was signing the loan—the quarter over to AgCountry and—for additional money, not just to extend loans out.  I was under 100-percent belief I was getting an additional $200,000 to $250,000."  To buttress this testimony, Kent McDougall directed the Court to an email he sent to Hoffert, Aanderud and Parks on March 10, 2016 in which he stated, "It does no good for me to refinance and pay down the operating debt if nothing will be readvanced."  Ex. 105.[15]

### D.    Deed from Michael and Bonita McDougall to Debtors

At Debtors' request, Michael and Bonita McDougall deeded the Home Quarter to Debtors.  Ex. 114.  According to Michael McDougall, Michael and Bonita McDougall transferred the deed to help Debtors qualify for an operating loan.  Michael McDougall testified that he understood AgCountry promised Debtors an operating loan, but he did not meet with AgCountry directly.  He received all the information about Debtors' loan eligibility through Debtors.  Likewise, the parties stipulated that Bonita McDougall did not talk to any representative of AgCountry before she signed the deed transferring the Home Quarter to Debtors.  The deed does not include language restricting or

---

[15] In the email, Kent McDougall stated:  "We all need to sit down together next week and come up with a solution.  It does no good for me to refinance and pay down the operating debt if nothing will be readvanced.  And I don't understand why a bank would term out debt on cattle but not give me anything to operate on.  Those cows will be dead by the time the next payment is do. I need to have an operating line of credit to take care of the banks collateral.  Without money for fuel and feed those animals aren't going to produce much of a payment for next year."  Ex. 105.

conditioning the transfer of the Home Quarter on Debtors' receipt of a new loan or refinancing from AgCountry.  Ex. 114.

Michael and Bonita McDougall signed the deed transferring the Home Quarter to Debtors on April 5, 2016, five days after Debtors signed the mortgage offering it as security for the eight loans summarized above.[16]  When asked why there was a delay between the March 31, 2015 meeting (during which Debtors granted a mortgage in the Home Quarter) and the execution of the deed, Michael McDougall explained that it took time to withdraw money from his retirement savings accounts to satisfy an unrelated debt secured by a mortgage on the property.  In addition to transferring property to Debtors, Michael McDougall also paid some of Debtors' 2016 operating expenses and planted crops in 2016 that Debtors used to feed their cattle.

### E.      April 6, 2016 Meeting between Debtors and Sem

On April 6, 2016 Kent McDougall called AgCountry to check on the progress of the refinancing.  He learned that Aanderud no longer worked at AgCountry.  Debtors scheduled a meeting with AgCountry Vice President Stacy Sem and another AgCountry representative on April 7, 2016.  Sem supervised Aanderud before he left AgCountry. Kent McDougall recalled the following from their meeting with Sem:

> He told us that we should have had this discussion a long time ago and been sat down to about our financial situation. And it was very clear that we weren't getting any new money at that time from signing that Home Quarter over.  Or signing the paperworks that we signed on.

---

[16] AgCountry delivered the deed to be recorded by Towner County Recorder on the same day.

Similarly, Erica McDougall recalled: "Stacy told us that somebody should have sat us down a long time ago and gone over this, and that things weren't looking good[.]"  Erica McDougall also testified that Sem remarked about Debtors' 60 percent debt-to-equity ratio, expressing concern about whether Debtors could repay AgCountry.  After the meeting with Sem, Debtors scheduled a meeting for the following day with AgCountry's Special Credit Department in Fargo, North Dakota.

### F.    Deed from Debtors to Michael and Bonita McDougall

Immediately after leaving their meeting with Sem, Debtors met with Attorney Cameron Sillers, who drafted a deed transferring the property back to Michael and Bonita McDougall.  Ex. 115.  Erica McDougall then drove to Cando, North Dakota, and recorded the deed.  Debtors did not know that AgCountry had already recorded the mortgage when they asked Attorney Sillers to draft the deed.

According to Erica McDougall, Debtors felt that AgCountry took advantage of them and that the property should be returned to Michael and Bonita McDougall if it could not serve its purpose as collateral for a new loan and debt restructuring.  Kent McDougall testified that Debtors deeded the property back to Michael and Bonita McDougall to protect Michael McDougall because Kent McDougall "was afraid that AgCountry was just going to take it with no exchange—that I wasn't going to get anything of benefit back out of it."

### G.    Communication between Debtors and Schoenherr

On April 8, 2015, Debtors met with Eric Schoenherr, a Senior Loan Officer with AgCountry's Special Credit Department, to discuss loan restructuring and Debtors' request for additional operating funds.  After the meeting, Schoenherr worked with

18

Debtors, who eventually proposed a plan that they hoped would serve as the basis to refinance their operation through AgCountry.[17]  Schoenherr testified that there was a lack of accurate 2015 year-end financial information about Debtors' operation, prompting him to request this data. Debtors promptly provided Schoenherr with financial information he requested but often supplemented the information they provided or changed their operating plan.  At trial, Schoenherr expressed that it was difficult to evaluate Debtors' plan because they frequently came to him with new information or new approaches to the plan.  Likewise, Kent McDougall was frustrated because he wanted to present a plan that would convince AgCountry to lend operating funds but did not know what "the final picture would be."

In addition to gathering financial information from Debtors, Schoenherr visited Debtors' property on April 15, 2016, to inspect the collateral.  After the farm visit and analysis of Debtors' financial information, Schoenherr prepared an AgCountry Credit Presentation in which he recommended that AgCountry deny Debtors' restructure, refinance and new loan request.  Ex. 113.

As with the March 30, 2016 Credit Presentation, Schoenherr's Credit Presentation included his review of Character/ Management, Capital, Capacity, Risk Chain and Collateral.  Ex. 113.  According to Schoenherr's analysis, Debtors did not satisfy any of the factors.  For example, under the factor "Character/Management,"

---

[17] In general, Debtors' proposed plan involved modifying their operation to "feed up" approximately 1,200 cull cows annually before selling them.  Kent McDougall testified that he developed this plan by consulting with a number of experts in the cattle industry. He stated that he discussed this general plan with Aanerud and Schoenherr at different times.  To succeed with this plan, Debtors requested a loan restructure and refinancing with a new operating loan for $700,000.

Schoenherr concluded: "It does not appear that the borrowers have a good handle of their current debt situation as they desire to add more debt to an already struggling unit."  Ex. 113 at 10.  In the "Capital" analysis, Schoenherr noted: "The working capital levels do not meet AgCountry minimum credit standards. . . . The main reason for this is the result of increased current debt levels from losses. . . . Overall, the balance sheet of the operation does not support the proposed restructure as the balance sheet does not meet any of the credit underwriting guidelines."[18]  Id.  Under "Capacity," Schoenherr noted: "The financials provided [show that since 2011 Debtors] have sustained four years of losses in a row.  The losses for the operation are concerning as the operating expense ratio has been above 100% for the past two years."  Id. at 10-11.

On cross examination, counsel asked Schoenherr if he would have reached the same conclusions if he had analyzed the issues two to three months earlier. Schoenherr testified that "it was possible" and he "probably" would have reached the same conclusions if he would have had the same information he gathered in preparing his Credit Presentation, but that information had not been gathered months earlier.  He admitted that the only significant changes in data from the date of his analysis and three months earlier were Debtors' current liabilities, which increased significantly in 2016.

Ron Byer, Schoenherr's supervisor, approved Schoenherr's recommendation to deny Debtors' loan and restructuring requests.  On May 3, 2016, Schoenherr sent Kent

---

[18] The Balance Sheet in the Credit Presentation shows that equity in Debtors' assets decreased from $2,426,470 in September 2014 to -$93,085 in April 2016.  Id. at 4.

McDougall a letter advising him that AgCountry denied Debtors' loan request.  Ex. 111.

Schoenherr also called Kent McDougall on May 4, 2016 to inform him of the denial.

Debtors did not appeal the denial.  In an email from July 29, 2016 to Schoenherr,

Kent McDougall requested that AgCountry release the mortgage on the Home Quarter,

which Schoenherr declined.  Ex. 224.

Debtors petitioned for bankruptcy relief under Chapter 12 of the Bankruptcy Code

on October 19, 2016.

## III.   ANALYSIS

In Count 1 of their Amended Complaint, Debtors allege AgCountry obtained

Debtors' consent to the mortgage on the Home Quarter through fraud.  Doc. 19 at ¶ 16.

They also claim AgCountry obtained Michael and Bonita McDougall's consent to

transfer the deed to the Home Quarter to Debtors through fraud.  Id.  Debtors cite

section 9-03-02 of the North Dakota Century Code as authority for this cause of action.

Section 9-03-02 provides:  "A consent which is not free is not absolutely void, but may

be rescinded by the parties in the manner prescribed by chapter 9-09."  N.D.C.C. § 9-

03-02.  They maintain that consent to the mortgage and Home Quarter transfer was not

freely given because it was obtained by fraud.  Debtors seek to rescind the mortgage

they granted to AgCountry, and they request that the Court declare that the deed from

Michael and Bonita McDougall is void or allow the McDougalls to rescind the deed.

In their brief, Debtors direct the Court to other North Dakota statutes supporting

this theory of recovery, including N.D.C.C. §§ 9-03-03, 9-09-02 and 9-03-08. Section 9-

03-03(3) provides that consent is not real or free when obtained by fraud, and section 9-

09-02(1) allows a party to a contract to rescind if his or her consent was obtained by

21

fraud.  Section 9-03-08 defines actual fraud.  At trial, Debtors argued that they met their burden of proving fraud under subsection 9-03-08(2) and are, therefore, entitled to rescind the mortgage.

Section 9-03-08(2) provides:

Actual fraud within the meaning of this title consists in any of the following acts committed by a party to the contract, or with the party's connivance, with intent to deceive another party thereto or to induce the other party to enter into the contract:

* * *

2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though that person believes it to be true[.]

N.D.C.C. § 9-03-08(2).

In 1991, the North Dakota Supreme Court recognized a statutory claim for relief based on negligent misrepresentation under subsection 9-03-08(2).  Bourgois v. Mont.-Dakota Utils. Co., 466 N.W.2d 813, 817-19 (N.D. 1991).  While subsections (1), (3) and (4) of section 9-03-08 require a plaintiff to show knowledge of or belief in falsity, subsection (2) requires no such showing.  Id. at 817-19; see also Castleman v. Wells Fargo Bank, N.A., 2010 WL 11448209, at *5-7 (D.N.D. Aug. 20, 2010); Doe v. Sw. Grain, 309 F.Supp.2d 1119, 1126 (D.N.D. 2004); Stainbrook v. Stax Elec., 2010 WL 11496895, at *4 (N.D. Mar. 8, 2010) (citing Bourgois, 466 N.W.2d at 817).  Likewise, a plaintiff does not have to show intent to deceive to prove fraud under subsection 9-03-08(2).  Bourgois, 466 N.W.2d at 817; Coop. Power Ass'n v. Westinghouse Elec. Corp., 60 F.3d 1336, 1342 (8th Cir. 1995); Stainbrook, 2010 WL 11496895, at *4.  Instead, the subsection only requires a statement based on insufficient information.  Bourgois, 466 N.W.2d at 817.  "'[A] statement made for the guidance of others which is not warranted

22

by the information of the person making it is classified as negligent

misrepresentation[.]'" Id. at 817 (citing Grenell v. Hermosa Beach, 103 Cal.App.3d 864,

871 (1980)).

Accordingly, to prove their cause of action under subsection 9-03-08(2), Debtors

must show, by clear and convincing evidence,[19] that:

(1) AgCountry and Debtors are parties to a contract, and AgCountry and the

McDougalls are parties to a contract;

(2) AgCountry made a positive assertion of that which was not true in a manner

not warranted by the information available to AgCountry, even though

AgCountry may have believed the statement to be true, which induced (a)

Debtors into granting a mortgage as security for the eight promissory notes at

issue and signing the Promissory Note/Loan Agreement modifications, and

(b) Michael and Bonita McDougall into transferring a deed to the Home

Quarter to Debtors;

(3) Debtors relied on the representations;[20] and

---

[19] "Fraud is never presumed, but must be proved by evidence that is clear and convincing." Dahl v. Messmer, 2006 ND 166, ¶ 8 (citing Kary v. Prudential Ins. Co. of Am., 541 N.W.2d 703, 705 (N.D. 1996)); see also Erickson v. Brown, 2008 ND 57, ¶ 26 (citing WFND, LLC v. Fargo Marc, LLC, 2007 ND 67, ¶ 25; Wagner v. Wagner, 2000 ND 132, ¶ 12; State Bank of Kenmare v. Lindberg, 471 N.W.2d 470, 474 (N.D.1991)).

[20] Northstar Founders, LLC v. Hayden Capital USA, LLC, 2014 ND 200, ¶ 27 ("A tort action for fraud requires . . . reliance on the false or misleading representation[.]"); Dahl, at ¶ 8 ("A key element in proving fraud . . . is reliance by the complaining party upon the false or misleading representations.") (citing Kary v. Prudential Ins. Co. of Am., 541 N.W.2d 703, 706 (N.D. 1991)); Hanson v. Acceleration Life Ins. Co., 1999 WL 33283345, at *5 (D.N.D. Mar. 16, 1999) ("A key element of establishing fraud is reliance upon the false or misleading representations.") (citing Kary, 541 N.W.2d at 706); Kary, 541 N.W.2d at 706 ("A key element in proving fraud and deceit is reliance by the complaining party

(4) Debtors suffered damages.

See Northstar Founders, LLC v. Hayden Capital USA, LLC, 2014 ND 200, ¶ 27 (listing

the elements to a claim under N.D.C.C. § 9-03-08); Bourgois, 466 N.W.2d at 818

(recognizing a claim for negligent misrepresentation).

### A. Debtors did not meet their burden of showing that AgCountry induced Michael and Bonita McDougall's consent to transferring the deed to the Home Quarter to Debtors by fraud.

Debtors offered no evidence that there was a contract between AgCountry and

Michael and Bonita McDougall.  To prove a claim under N.D.C.C. § 9-03-08(2), Debtors

must show a contractual relationship.  Dewey v. Lutz, 462 N.W.2d 435, 439 (N.D.

1990); Coop. Power Ass'n, 60 F.3d at 1342-43.  Their claim fails for this reason alone.

Additionally, Debtors offered no evidence that AgCountry communicated directly

with either Michael or Bonita McDougall about transferring the Home Quarter.  To the

contrary, Michael McDougall admitted at trial that he did not meet with AgCountry but,

rather, obtained all information about Debtors' communication and transactions with

AgCountry through his son and Erica McDougall.  Likewise, Bonita McDougall did not

talk with AgCountry representatives before she signed the deed transferring the Home

Quarter to Debtors.  Michael and Bonita McDougall relied entirely on Debtors'

explanations and representations regarding their loan transactions with AgCountry.

These second hand representations are not sufficient to show that AgCountry induced

Michael and Bonita McDougall to transfer the deed to the Home Quarter.  This claim is

dismissed.

---

upon the false or misleading representations.") (citing Dvorak v. Am. Family Mut. Ins. Co.,
508 N.W.2d 329, 332 (N.D. 1993)).

**B.    Debtors did not meet their burden of showing that AgCountry
induced Debtors' consent to granting a mortgage in the Home
Quarter by fraud.**

In 2014, the North Dakota Supreme Court reaffirmed its view that statements of

opinion, puffery or sales talk do not constitute fraud.  <u>Golden Eye Res., LLC v. Ganske</u>,

2014 ND 179, ¶¶ 23-25.  Likewise, future promises or predictions of future events do not

constitute fraud, especially where intent to deceive is absent.  <u>Id.</u>  The North Dakota

Supreme Court explained:

> "Ordinarily, misrepresentations amounting to fraud which will avoid a
> contract must relate to past or present facts, and cannot consist of
> unfulfilled promises or predictions with respect to future events,
> especially where intent to deceive is absent. . . .
>
> "One of the essential elements of fraud is that there be a false
> representation of a material fact which either exists in the present or
> has existed in the past, and a mere expression of an opinion in the
> nature of a prophecy as to the happening or nonhappening of a future
> event is not actionable."

<u>Id.</u> at ¶ 23 (quoting <u>Kary v. Prudential Ins. Co. of Am.</u>, 541 N.W.2d 703, 705-06 (N.D.

1996); <u>Sperle v. Weigel</u>, 130 N.W.2d 315, 320 (N.D. 1964) (finding that a statement

about potential earnings was "'an opinion in the nature of a prophe[c]y as to the

happening of a future event and is not actionable.'") (citation omitted)).

Debtors argue that "AgCountry induced the McDougalls to enter into the

extension agreement by holding out the promise of further funds in order to gain more

collateral to secure their position."  Doc. 29 at 7. Specifically, they claim that Aanderud

repeatedly suggested that the prospects for restructuring and financing a new loan were

good.  Debtors explained that they were in frequent contact with Aanderud and he

consistently represented that he was working on their financing request, that it "looked

good," that everything was "fine" and that they should hear something about their loan

25

and refinancing request soon. Debtors argue that Aanderud's representations were not warranted because Debtors were delinquent on several notes and about to be delinquent on several other notes, and their financial information showed that they did not meet AgCountry's lending standards. More specifically, they claim AgCountry knew that Debtors did not exhibit a level of solvency sufficient to qualify for a new operating loan under AgCountry's lending standards <u>before</u> Debtors signed the Promissory Notes/Loan Agreement Modifications and mortgage. They argue that the March 30, 2016 Credit Presentation shows AgCountry knew this information. Alternatively, they maintain that they kept records and promptly responded to all information requests and would have promptly provided any information Aanderud requested, which would have demonstrated their ineligibility for new loans and refinancing months earlier.

There is compelling evidence that Aanderud's encouraging representations regarding the possibility of refinancing were not warranted by the information available to AgCountry and that these positive assertions induced Debtors into granting a mortgage in the Home Quarter. This evidence does not establish negligent misrepresentation under N.D.C.C. § 9-03-08(2), however. Aanderud's statements to Debtors about a potential loan and refinancing agreement are a prediction of a future event or his opinion about what might happen in the future. These types of statements are not actionable. <u>Golden Eye Res.</u>, at ¶ 23. Also, to the extent Debtors allege that Aanderud promised a new loan or refinancing, these unfulfilled promises or predictions about AgCountry loans do not constitute fraud. <u>Id.</u> Further, it is not apparent that

26

Debtors met their burden of proving reasonable or justifiable reliance, assuming they were required to do so.[21]

Accordingly, the Court finds that Debtors did not meet their burden of showing actual fraud under N.D.C.C. § 9-03-08.  Count 1 of their Complaint is dismissed.  The Court also finds that AgCountry has a valid and enforceable mortgage lien against the Home Quarter.  Debtors' request to rescind the mortgage is denied.  Count 2 is dismissed as well.

## IV.    CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered in favor of AgCountry and against Debtors.

Dated:  July 10, 2017.

_Shon Hastings_

Shon Hastings, Judge
United States Bankruptcy Court

---

[21]  AgCountry argues that Debtors did not reasonably rely on Aanderud's communications that they may receive financing from AgCountry.  It cites Kary as support for the reliance standard. Doc. 30 at 5. In Kary, the North Dakota Supreme Court concluded that the plaintiff did not rely on the defendant's statements.  Kary, 541 N.W.2d at 706-07.  It did not characterize the standard as "reasonable" or "justifiable" reliance.  See id.  In fact, the ruling suggests that the court applied an actual reliance standard.  See id.  Similarly, the North Dakota Supreme Court in Northstar and Dahl refer only to reliance, not reasonable reliance.  See Northstar Founders, LLC, at ¶ 27; Dahl, at ¶ 8.  However, the North Dakota Supreme Court in Kary cited Dvorak, which in turn cited to a case referring to reasonable reliance and a treatise that referred to justifiable reliance.  See Dvorak, 508 N.W.2d at 332 (citing Phoenix Assurance Co. of Can. v. Runck, 366 N.W.2d 788 (N.D.1985) (discussing actual reliance but ruling that the trial court's finding of reasonable reliance is not clearly erroneous) and 37 Am. Jur. 2d Fraud and Deceit §§ 1, 296 (1968) (referring to justifiable reliance)).  Consequently, it is not clear whether the reliance standard applicable to fraud claims under section 9-03-08 is actual reliance, reasonable reliance or justifiable reliance.